IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.   1:16-CR-335 (MAD) |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DIANE BACKIS,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

### I.  INTRODUCTION AND FACTUAL BACKGROUND

The United States of America ("United States") hereby files its sentencing memorandum requesting that the Court impose a sentence within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") advisory range. The United States adopts, with the exception of the loss-calculation described below, the facts and calculations as set forth in the Final Presentence Investigation Report ("PSIR") prepared in this matter by the United States Probation Office ("Probation Office").

### II.  APPLICABLE STATUTORY AND GUIDELINES PROVISIONS

#### a. Statutory Provisions

The defendant's conviction under Count One of the Information for mail fraud in violation of 18 U.S.C. § 1341 subjects her to a maximum term of imprisonment of 20 years and a maximum fine of $250,000. The defendant's conviction under Count Two of the Information for filing a false tax return in violation of 26 U.S.C. § 7206 subjects her to a maximum term of imprisonment of three years and a maximum fine of $250,000. Further, in addition to a mandatory $200 special assessment, the defendant may be required to serve a term of supervised release of up to three years pursuant to 18 U.S.C. § 3583. The Information also contains a forfeiture allegation, which

the defendant admitted, requiring the defendant to forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all right, title, and interest in property which constitutes or is derived from proceeds traceable to the offense, including a money judgment in an amount no less than $3,500,000.00.[1]

### b. Guidelines Provisions

The United States agrees with the PSIR that the base offense level is seven pursuant to U.S.S.G. § 2B1.1(a)(1). Pursuant to the plea agreement, *see* Dkt. No. 3 at ¶ 6(b), the parties stipulated that the loss amount was at least $25,000,000, resulting in a 20-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(K).[2] The PSIR also correctly scores an additional two levels pursuant to U.S.S.G. § 2B1.1(b)(10)(C) because the offense involved sophisticated means. The PSIR also correctly scores an additional two levels pursuant to U.S.S.G. § 3B1.3 because the defendant abused a position of private trust.[3] After a three-point reduction for timely acceptance of responsibility, the adjusted offense level, taking into account the stipulated loss amount, *id.*, is 28.

---

[1] The parties have reached, in principle, an agreement with the defendant and her husband concerning forfeiture of various assets, including those in the preliminary order of forfeiture, and anticipate presenting the Court with a proposed final order of forfeiture in the near future. *See* Dkt. No. 32.

[2] The PSIR scores the loss as exceeding $25 million, resulting in a 22-level enhancement. The United States does not endorse any recommendations in the PSIR that are inconsistent with stipulations or other provisions in the plea agreement.

[3] The defendant's responsibilities far exceeded "mail, data input and some sales." Dkt. No. 33 at 5. As Cargill explained in its September 22, 2017 letter to the Court, "[a]mong other things, she was responsible for making grain sales to customers in the greater Albany region, and she was also responsible for hand[l]ing the accounting-related activities associated with these grain sales." This is far more authority and discretion than what is typically given to "a cashier slipping money into her pocket." *Id.* at 7. The defendant was trusted by Cargill to negotiate prices for grain worth millions of dollars. She betrayed that trust by selling grain at prices dramatically below Cargill's cost. The defendant was trusted by Cargill to properly route customer payments that were delivered to the Port of Albany rather than a third-party lockbox. In connection with that task, the defendant was trusted to handle negotiable instruments worth enormous sums of money and, moreover, identify the accounts and contracts to which those negotiable instruments should be credited. She betrayed that trust in both respects by stealing some of the negotiable instruments that passed through her hands and misapplying funds among customer accounts to hide her actions. The defendant

### c. Criminal History Category

According to the PSIR, the defendant's criminal history category is I.  *See* PSIR ¶ 61.  The United States agrees with the Probation Office's determination of the defendant's criminal history category under the Guidelines.  Based on a criminal history score of I, and an adjusted offense level of 28, the advisory Guidelines range for the defendant is a term of incarceration of 78-97 months and a fine of $25,000 to $250,000.

## III. SENTENCING RECOMMENDATION

Based on all of the information before the Court, the United States respectfully requests that the Court sentence the defendant to a term of imprisonment within the Guidelines, a monetary fine, order restitution to the victim of at least $3,500,000, and impose a term of supervised release within the Guidelines range.[4]  The sentence that the United States recommends here is sufficient but not greater than necessary to comply with the sentencing purposes set forth in 18 U.S.C. § 3553(a).

The defendant was a 30-year employee of one of the world's top corporations, Cargill, Inc. ("Cargill").  Cargill is involved in a variety of industries, mostly tied to food production, ranging from growing corn to financial services.  In addition to providing these important products and

---

was also trusted by Cargill to book receivables and inventory in Cargill's accounting system properly, ensuring that Cargill had an accurate record of what it had sold and, even more importantly, what it was owed.  She betrayed that trust, too, by making false entries and then deleting them to cover her tracks and prevent Cargill from identifying what it was owed, resulting in direct pecuniary losses.  The nature of the defendant's relationship with Cargill was clearly "quasi-fiduciary" so as to trigger application of U.S.S.G. § 3B1.3.

[4] Cargill has requested that the Court order that the defendant pay restitution in excess of $3,500,000.

services to the global market, Cargill employs over 150,000 people in 70 countries around the world, many of whom depend on the company for their livelihood.

Cargill trusted the defendant to handle the daily operations of its grain-distribution facility at the Port of Albany, which services a variety of customers—stretching from local dairy farmers to sophisticated commodity traders—throughout the northeastern United States. The defendant came to work early each morning and seemingly performed exactly what was asked of her: she communicated with customers, oversaw grain deliveries and pickups, negotiated contracts, created invoices, received and processed payments, updated the accounting software, and provided information to company management in Minnesota. She was, seemingly, a veteran employee who faithfully oversaw a facility that, between 2005 and 2016, handled over $200 million worth of grain products.

Behind the scenes, though, the defendant was coordinating a multifaceted accounting fraud that resulted in her diverting over $3 million to her personal bank accounts, and, in the process of continuing and disguising that fraud, caused Cargill to suffer, by its account, over $50 million in losses. For over a decade, the defendant was engaged in a calculated, wide-ranging, protracted, and—most tellingly—successful scheme to steal money from Cargill. Through a series of carefully planned, well-timed, and consistently executed steps, the defendant defeated the accounting controls that Cargill implemented to detect and prevent theft and accounting improprieties.

The first aspect of the defendant's fraud involved taking advantage of the "float" between Cargill's accounts receivable and inventory. At the turn of each month, the defendant created numerous false entries in Cargill's accounting software. The false entries made it appear to others

within Cargill that Cargill had invoiced customers that had purchased products at the Port of Albany and, therefore, that payment from those customers was imminent. The false entries also generated paper invoices at the Port of Albany. Rather than mailing or emailing those paper invoices to customers as required, however, the defendant destroyed them. Cargill personnel in Minnesota tasked with performing monthly accounting reconciliations relied on those false entries, and the defendant's representations that she was sending the resulting invoices to customers, to conclude that Cargill's receivables were commensurate with routinely verified inventory at the Port of Albany. After that reconciliation process was complete, however, the defendant logged back into Cargill's accounting system and deleted, or "reversed," the false entries. By reversing the false entries, inventory at the Port of Albany was booked as depleted, but the commensurate revenue was no longer booked as a receivable. The defendant, therefore, was able to receive incoming payments from customers for delivered products "off the radar" and without Cargill's accounting team anticipating prompt receipt of those payments.

The second aspect of the defendant's fraud involved intercepting, and then stealing or misattributing, customer payments. Cargill's accounting controls required that customers from the Port of Albany send payments to a lockbox controlled by a third party. The defendant, however, bypassed that accounting control by destroying the invoices automatically generated by Cargill's accounting software that instructed customers to remit their payment directly to the third-party lockbox. Instead, the defendant—day after day, month after month, year after year—created hundreds of fraudulent invoices in Microsoft Word that instructed customers to remit payment to the defendant at the Port of Albany. She then routinely mailed those fraudulent invoices to customers, causing customers to send payments directly to the defendant. This enabled the

defendant to steal millions of dollars in payments. This aspect of the scheme also enabled the defendant to obfuscate the state of Cargill's books by intercepting and misapplying customer payments from one customer's account to another, and thereby avoid detection of her theft and the snowballing discrepancy between inventory and receivables. Notably, the defendant kept a complicated and detailed paper ledger—unbeknownst to Cargill—that she used to track customer payments under her rogue billing system. Relying, in part, on this ledger, the defendant misattributed payments from one customer to another and then mailed those payments, with those inaccurate attributions, to the third-party lockbox. The steward of the lockbox, relying on the defendant's inaccurate attributions, applied payments per the defendant's instructions, resulting in a rat's nest of inaccurate payments among customer accounts. Misapplying customer payments also prevented Cargill personnel in Minnesota from detecting significantly unpaid customer balances by "leveling out" payments among customers so that no one customer from the Port of Albany would have, at a given time, a balance substantial enough to trigger an inquiry. Additionally, because the defendant was stealing a significant percentage of payments from one customer and misapplying other customers' payments to that customer's account, she prevented Cargill from identifying the inconsistency between deliveries and receivables. The accounting reversal process described above also enabled the defendant to disguise the snowballing differential between revenue from the Port of Albany and product deliveries thereto.

  The third, and most significant, aspect of the defendant's fraud involved entering into contracts with customers to sell products at unauthorized, below-cost prices. Specifically, the defendant negotiated contracts with customers to sell grain products at prices substantially below what she knew to be Cargill's costs. The fraudulent invoices the defendant created and mailed to

customers reflected transactions for these below-cost prices. The defendant took numerous steps to hide her unauthorized activities from Cargill. For example, she made false entries into Cargill's accounting software indicating that Cargill was charging prices that included a profit margin. She also routinely made false representations via email and telephone conversations to Cargill personnel in Minnesota that she was charging—and that customers were paying—prices that included a profit margin. In fact, though, the defendant was charging prices significantly below Cargill's costs to acquire and ship product to the Port of Albany, resulting in tens of millions of dollars in hard losses. Cargill estimates that these losses exceed $35 million, and this estimate does not include sunk overhead costs, the profit that Cargill would normally make on such sales, the substantial costs incurred with the investigation, reputational harm, or potential civil liabilities. All told, these costs could exceed $50 million. One obvious reason for this component of the fraud was that it ensured the Port of Albany had a very robust business, allowing the Port of Albany to continue operating as an ostensible profit center, and thereby allowing to defendant to continue stealing a portion of customer payments for her own use.

  At bottom, the defendant used her position in the accounting department of a multibillion-dollar corporation to establish a rogue accounting system that bypassed standard corporate controls. She oversaw a decade-long fraud, involving hundreds of false entries into accounting software, fraudulent phone calls, fraudulent emails, fraudulent invoices, unauthorized commercial contracts, an unauthorized business ledger, the routine misapplication of customer payments, and carefully-timed accounting reversals. The defendant's activities were part of a willful pattern, designed to enrich herself, and caused a sophisticated corporation to lose a staggering amount of money that she will never be able to repay.

All of that said, it is clear that the defendant, who has no criminal history, is deeply ashamed of her behavior and understands that she will pay a high price for it. She is, by many accounts, a kind and pleasant person. She is intelligent and has a supportive family. It is unlikely the defendant will re-offend in the future. Additionally, she has cooperated with the government from the outset and has accepted responsibility for her conduct. Nonetheless, a Guidelines sentence is appropriate in this case to send a message that those who devise and execute complicated, lengthy frauds—particularly those resulting in astounding financial losses, as in this case—face enormous consequences. *See, e.g., United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crime are 'more rational, cool, and calculated than sudden crimes of passion or opportunity' these crimes are "prime candidates for general deterrence.'"). In this case, the defendant came to work, every day, and expended an enormous amount of time and effort stealing money from Cargill and then taking steps to cover her tracks. A strong message of deterrence, and the need to respect the law, will provide the necessary disincentives to those, like the defendant, who are trusted to handle important commercial transactions and handle negotiable instruments worth millions. The sentence this Court imposes will be used by many to gauge whether the reward of stealing is worth the consequence of getting caught. Cargill, fortunately, was able to withstand the enormous financial harm that the defendant caused; many companies could not. But the fact that Cargill can sustain such enormous losses does not mean that it should. Imposing a Guidelines sentence is the surest way to protect companies, like Cargill, from would-be thieves, like the defendant, and promote respect for the law. The Court's sentence should make plain that lengthy, complex fraud schemes, causing more than $50 million in losses, result in very substantial periods of incarceration.

"[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *see, e.g., Gall v. United States*, 552 U.S. 38, 46 (2007) (Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").  Moreover, within-guidelines sentences promote Congress's goal in enacting the Sentencing Reform Act "to diminish unwarranted sentencing disparity."  *Rita v. United States*, 551 U.S. 338, 354 (2007).

Based on all of the information before the Court, the United States respectfully requests that the Court impose a sentence consistent with the Guidelines.  Under the facts present here, such a sentence will be sufficient, but not greater than necessary to comply with the sentencing purposes in 18 U.S.C. § 3553(a)(2).

Respectfully submitted this 5th day of October, 2017.

                                        GRANT C. JAQUITH
                                        Acting United States Attorney

By:                                    
                                        Wayne A. Myers
                                        Assistant United States Attorney